1 | **THE LAW OFFICES OF RONALD B. BASS**
2 | Ronald B. Bass (#89022)
  | ron@bass-law.net
  | Sandra L. Benabou (#201105)
3 | sandra@bass-law.net
  | Janice S. Yi (#255645)
4 | janice@bass-law.net
  | 560 Lennon Lane, Suite 100
5 | Walnut Creek, CA 94598
  | Telephone:  (925) 256-9855
6 | Fascimile:  (925) 943-1427

7 | Attorneys for Plaintiffs

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | MARK ANDERSEN, HOLLY
   | ANDERSEN, MHA FAMILY
11 | HOLDINGS, INC., JAMES J.
   | CARLSON, MARILYN N. ROACH-
12 | CARLSON, JAMES CARLSON LLC,
   | MICHAEL GEISLER, M & E FAMILY
13 | CARE, LLC, DAVE HINDERS,
   | HINDERS HOME CARE INC., BARRY
14 | HOWLAND, GIGI HOWLAND,
   | CHRISTOPHER JENKINS, CS FAMILY
15 | VENTURES INC., CSAB
   | MANAGEMENT, INC., WADE
16 | LUDERS, SOUTH BAY CARE, LLC,
   | MICHAEL MCKAIG, KEN PETERS,
17 | KERRY PETERS, THE KPETERS
   | GROUP, a California Corporation,
18 | CHARLAYNE REDMON, DWAYNE
   | REDMON, LEDGEWOOD
19 | ENTERPRISE INC., JAMES THELEN,
   | THELEN ENTERPRISE, INC.
20 |
   |                  Plaintiffs,
21 |
   |           vs.
22 |
   | GRISWOLD INTERNATIONAL, LLC,
23 | GRAHAM WEIHMILLER,
   | THOMAS MONAGHAN,
24 | DIANE WALKER, PATRICK SPAAN,
   | GREG BAST and MICHAEL MAGID,
25 |
   |                  Defendants.
26 |

Case No.:

COMPLAINT

JURY TRIAL DEMANDED

27 |
28 |

1    Plaintiffs, for their complaint against Defendants, by their attorneys, allege as
2  follows:

3                              **Nature of the Action**

4    1.    This is an action by franchisees of Griswold International, LLC
5  ("GHC") against GHC for common law fraud, negligent misrepresentation,
6  fraudulent concealment and violation of the California Franchise Investment Law
7  (Cal. Corp. Code § 31000 *et seq.*) in connection with the sale of their franchises;
8  constructive termination in violation of the California Franchise Relations Act (Cal .
9  Bus. & Prof. Code § 20000); and breach of contract and the duty of good faith and
10  fair dealing in performing and failing to perform the franchise agreements.  Plaintiffs
11  purchased franchises for the delivery of non-medical home care services for persons
12  in need of such services—generally, senior citizens and disabled persons
13  ("Clients")—upon the representations of the franchisor, GHC, that it had a "unique"
14  "proven" system under which the persons providing such care ("Caregivers")
15  operated as independent contractors, so that neither the Clients nor the franchisee
16  was responsible for taxes or compliance with wage and hour or other labor or
17  employment laws.  This "Independent Contractor Model," ("IC Model") according to
18  GHC, gave GHC a substantial advantage over competitors, who required franchisees
19  to employ the Caregivers directly or through a third party (the "Staffing Model").
20  The "substantial competitive advantage" was, supposedly, that Clients paid less and
21  Caregivers received more, since the Caregivers purportedly were self-employed and
22  carried the burden of withholding taxes and self-employment taxes, and were
23  exempt, as independent contractors, from wage and hour regulations.  GHC,
24  Monaghan and the other Defendants represented the IC Model as proven, thoroughly
25  tested, validated by 30 years' experience, documented and defended by the best legal
26  minds, and supported by GHC's ongoing specialists in state and local laws and
27  regulations, and that it was specifically valid in California.

28

2.     But none of this was true.  The classification of caregivers as independent contractors has been under attack for several years throughout the United States by state labor and employment departments, including the California Employment Development Department (EDD), and federal agencies such as the Department of Labor and the IRS, as well as private institutions such as hospitals, insurance companies and hospice agencies that refer Caregivers to clients, as well as Caregivers themselves.  These governmental entities and private parties contend that the Caregivers do not qualify as 'independent contractors' under applicable laws, but are in fact domestic employees and are employed by either the Client, the franchisee (or GHC because of the degree of control over the engaged Caregiver). Some jurisdictions have held that the "Independent Contractor Model" was merely a label to avoid compliance with tax, wage and hour and other labor laws and obligations such as workers compensation insurance, disability insurance and unemployment insurance and taxes.  In fact, in one state, Massachusetts, GHC had already converted to an employment model, in which either the Client or the Franchisee employs the Caregiver, and in New Jersey, GHC had adopted a modified independent contractor model as early as 2001.

3.     In California, the IC Model was, and for years had been, widely viewed as unlawful by Caregivers, Clients and even the American Board of Home Care, a professional organization of the home care industry.  Additionally, legislation that potentially affected the status of Caregivers as independent contractors had been under active consideration by the California Legislature since February 2011.  In late 2013, the California legislature passed AB 241, a provision requiring that Caregivers be paid overtime and making certain other changes; this bill was a successor to AB 889, which had been pending since February 2011.  GHC has been keenly aware of challenges to its IC Model for several years, at least since 2009, and knew or should have known that such challenges existed in California when it first started offering franchises in this state.

4. AB 241 provides an 'exemption' whereby employment agencies are not deemed to be employers of Caregivers if they register with the state and if they comply with various restrictions on the services offered and fees collected. This exemption does not affect the classification of the caregiver as an employee, which is the primary benefit of the IC model, but does protect the employment agencies from employer duties (provided the employment agency does not supervise the caregiver or receive fees other than a one-time placement fee).

5. Ostensibly to assure that Griswold franchisees are not deemed employers of the caregivers they refer, on January 1, 2014 GHC at first recommended, and since about February, 2014, now mandates its California franchisees to become employment agencies, and effectively require their Clients to accept the obligations as employers of their Caregivers and thereby abandon the IC Model. Subsequently, the California Employment Development Department (EDD) has conducted an audit of a Griswold franchisee and determined that the Caregiver is, in fact, the employee of the Client but not the employee of the franchise (even though the franchise is not an employment agency).

6. Plaintiffs each purchased a franchise to provide non-medical home care services, counseling and support to clients in California under the IC Model, and in reliance on the representations of Defendants, had never considered or intended to become employment agencies. Plaintiffs invested in the GHC system specifically because it offered lower cost options for Clients without the burdens of the plaintiff franchise having to be the employer of Caregivers. Neither being an employer of Caregivers, nor placing Caregivers as employees of Clients was what the Plaintiffs bargained for or contracted for with GHC.

7. At the time GHC was selling these franchises to Plaintiffs, it was well aware of the challenges and infirmities of the IC Model; it was aware of legislative efforts to specifically define Caregivers as employees; and it was aware that the IC Model was widely criticized, if not unlawful, in California, but it failed to disclose

those challenges, criticisms or infirmities in its Franchise Disclosure Document as required by California and Federal law, or under the common law, and instead sold the IC Model to Plaintiffs as proven, reliable, and the best choice for a prospective franchisee of a non-medical home care service.

8.    As a result of Defendants' misrepresentations and violation of the California Franchise Investment Law and other breaches of law, Plaintiffs, collectively, are seeking rescission in an amount in excess of $3,000,000 plus damages, costs, and attorneys' fees.

## Jurisdiction and Venue

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial number of the acts and transactions underlying the claim occurred in this district.

## Parties

11.    Each of the plaintiffs is a resident of California and is a franchisee of Griswold International, Inc., pursuant to franchise agreements as follows:

a.    Mark and Holly Andersen and MHA Family Holdings, Inc., a California corporation with its principal place of business in California ("Andersen")– Agreement for Northwest Orange County, Ca., signed June 13, 2012.

b.    James J. Carlson, Marilyn N. Roach-Carlson and James Carlson LLC, a California limited liability company whose sole member is James J. Carlson ("Carlson") – Agreement for a territory that came to be known as Diablo North and South, which includes Contra Costa County, California, signed November 23, 2012.

c.    Michael Geisler and M&E Family Care LLC, a California limited liability company whose only member is Michael Geisler, a California resident, Agreement for Burbank and Hollywood Hills, Ca., signed September 9, 2013.

d.    Dave Hinders and Hinders Home Care, Inc., a California Corporation whose principal place of business is in California ("Hinders") – Agreement for Rancho Cordova and Folsom, Ca., signed December 6, 2012.

e.   Barry and Gigi Howland ("Howland") – Agreement for Poway, Escondido and Santee Ca., signed November 15, 2012

f.   Christopher Jenkins, CS Family Ventures, Inc. and CSAB Management, Inc., both of which are California corporations with their principal places of business in California ("Jenkins") – Agreements for West Orange County signed August 15, 2009, West San Diego County signed September 9, 2009, and Palm Springs, Ca., signed March 10, 2010.

g.   Wade Luders and South Bay Care, LLC, a California limited liability company whose only member is Wade Luders, a California resident ("Luders") – Agreements for South San Jose, South Peninsula, and Campbell, Ca., signed October 31, 2011.

h.   Michael McKaig ("McKaig") – Agreement for Mission Viejo Ca, signed October 8, 2012.

i.   Ken and Kerry Peters ("Peters") and The KPeters Group, a California Corporation– Agreements for Costa Mesa and Tustin, Ca. dated November 28, 2012.

j.   Charlayne and Dwayne Redmon and Ledgewood Enterprise, Inc., a California corporation with its principal place in California ("Redmon") – Agreement for Dublin, Ca., signed December 7, 2011.

k.   James Thelen, and Thelen Enterprises, Inc., a California corporation with its principal place of business in California ("Thelen") – Agreement for Yorba Linda, Ca., signed July 3, 2012.

12.   The Plaintiffs were not, at the time they purchased their franchises, knowledgeable about the non-medical home care industry, about franchising, or about the classification of workers as independent contractors or employees.

13.   GHC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Pennsylvania. Upon information and belief, GHC has one member that is a Delaware limited liability corporation whose members are citizens of New York. None of the owners or members of GHC is a citizen or resident of any state of which any of the Plaintiffs is a citizen or resident.

14.   Each of the individual defendants was an officer, employee or agent of GHC and is liable to plaintiffs either under the California Franchise Investment Law

as an officer, director or control person, or as a person who made specific misrepresentations to Plaintiffs, or both.

      a.    Graham Weihmiller was, at the relevant times, the CEO of GHC and a resident of Pennsylvania.

      b.    Thomas Monaghan was at the relevant times Vice President or CEO of GHC and a resident of Pennsylvania.

      c.    Diane Walker was at the relevant times a Vice President of GHC and a resident of Pennsylvania.

      d.    Michael Magid was at the relevant times a franchise sales person for GHC and a resident of Pennsylvania.

      e.    Greg Bast was at the relevant times a franchise sales person for GHC and a resident of Minnesota.

      f.    Patrick Spaan at the relevant times a franchise sales person for GHC and a resident of Oklahoma.

## **Facts**

15.    With the aging of the baby boomer generation and efforts in both the public and private sectors to reduce the cost of health care, the market for unskilled, non-medical home care attendants has increased tremendously in the last decade. Such home care attendants, or "Caregivers," assist persons in need—primarily senior citizens and disabled persons—with daily non-medical tasks such as getting dressed, preparing meals and going to the bathroom. Non-Medical home caregivers may visit a Client a few times a week or every day, often spending many hours with the Client.

16.    The arrangement for compensation of the Caregiver may take any of several forms. Most home care providers employ the Caregivers as employees and send the employee Caregivers to service Clients. This is referred to as the Staffing Model. GHC does not employ Caregivers but under its IC Model refers to Clients independent, self-employed contractor-Caregivers who each pay their own taxes and self-employment obligations, and who are allegedly exempt from wage and hour laws and other employment requirements. The Client pays the Caregiver an hourly rate, and pays the franchisee separate fees for referral of the Caregiver and for ongoing consulting, monitoring and assistance.    In another common model, the

1 Client may be the Caregiver's employer, and be subject to wage and hour laws,
2 withholding requirements and social security, Medicare and similar contributions.
3 This is referred to as the "Employer of One Model."

4     17.   GHC is a franchisor that has been in business for over 30 years. It
5 franchises businesses to act as referral sources on the "Independent Contractor" or
6 "IC" Model. Franchisees identify Caregiver candidates, and work with the Client to
7 develop a service plan that includes Client goals, Measures and Outcomes, including
8 documentation of all initial needs. Franchisees regularly check in with the Client and
9 make regular home visits. GHC franchisees receive a fee for the service of referring
10 the Caregiver, and fees for ongoing services. The Client acts as the contractor for the
11 independent contractor Caregiver.

12     18.   In recent years across many industries, and particularly in the non-
13 medical home care industry, "independent contractor" arrangements have been under
14 attack by groups of purported independent contractors, and by federal and state
15 agencies, as shams or schemes to avoid compliance with state and federal tax laws,
16 and wage and hour laws governing employment relationships as well as other related
17 costs such as workers compensation insurance, disability insurance and
18 unemployment insurance. These attacks have contended that the independent
19 contractor arrangements are in fact employment relationships. Thus, independent
20 contractor arrangements for Federal Express Ground Delivery drivers, janitors who
21 clean office buildings, and maid service franchises have come under attack in court
22 cases that have been widely publicized in industries that use or attempt to use
23 independent contractors.

24     19.   In the non-medical home care industry in California, there is widespread
25 belief that Caregivers cannot properly be classified as independent contractors under
26 California law, because Caregivers generally are not highly skilled or trained
27 professionals who are in business for themselves, but instead are subject to specific
28 guidance and control by the Client.

20.   GHC, as a franchisor, undertook to sell to Plaintiffs franchises for the operation of Griswold Home Care businesses beginning in or about 2009. Most of the plaintiffs purchased their franchises in 2012, and opened for business in early 2013.   In connection with those sales, GHC or its agents or brokers made the following representations:

a.   The GHC System, based on the IC Model, was a "proven" system led by a "progressive team of experts on the cutting edge of business development strategy and execution."

b.   GHC offered franchise owners "full support with licensing and state specific compliance paperwork."   Franchisees would be "informed and ahead of the curve" and GHC was "engaged politically both at the state and federal levels."

c.   In connection with the purchase of the franchise, GHC specifically represented that Caregivers were validated as self-employed, each had obtained his or her own EIN number, and that GHC had operated that way for 30 years successfully.

d.   GHC represented that it operated under two specific federal guidelines that governed the independent contractor model and insulated it from attack—"Federal safe harbor Code 530" and "Federal IRS Code 3506."   These safe harbors and guidelines were represented as governing and protecting the entire model, regardless of state law.

e.   GHC was competent to and did provide guidance in order to keep franchisees compliant with state regulations.

f.   When Plaintiffs asked representatives of GHC whether there were problems with the IC Model, based upon information that Plaintiffs had heard in the market, GHC representatives responded that competitors were spreading "misinformation" about GHC's competitive advantages and that GHC would train franchisees to "go out and win."

21.   Defendants made these representations to each of the franchisees as follows:

a.   Andersen:   Greg Bast made 20(a) in an email April 24, 2012; 20(b) in an email April 26, 2012; 20(c) in emails April 24 and 26, 2012 and May 11, 2012.   Diane Walker made 20(c) verbally at Discovery Day on June 7, 2012 and on June 21, 2012; and during Home Care Academy, July 23, 2012.   Marguerite Mertz made 20(c) during Home Care Academy July 24, 2012 and by email September 28, 2012; and Michelle Still made 20(c) during Home Care Academy July 17, 2012.   Marguerite Mertz made 20(d) by email September 28, 2012 and Monica Herzog made 20(d) at Home Care Academy July 17 – 27, 2012.   Tom Monaghan and

9

Diane Walker made 20(e) at Discovery Day, June 6 and 7, 2012. Greg Bast told Mark Andersen in around May 2012 to contact existing franchisees but not to contact Christopher Jenkins, an existing franchisee, prior to purchasing the franchise because, upon information and belief, he wanted to keep concerns that Mr. Jenkins had about the IC model hidden from Andersen.   At Discovery Day, June 6 or 7, 2012, Thomas Monaghan similarly told Andersen not to contact Christopher Jenkins because, upon information and belief, Mr. Monaghan wanted to keep concerns that Mr. Jenkins had about the IC model hidden from Andersen.

b.     Carlson:  GHC, Monaghan, Magid and Weihmiller made the following representations at Discovery Day in September, 2012: Paragraph 20(a) and (c); Magid and Monaghan made 20(b) at dinner before Discovery Day and again at Discovery Day in September 2012.  The entire executive team repeated 20(c) in emails, conference calls and presentations between September and December 2012.  Magid made 20(d) and (e) in an email dated October 5, 2012 and stated further that GHC worked with the most pre-eminent attorney in the country to protect the brand at the state and federal levels and thus provided sound advice to all franchisees.  Magid made 20(f) in emails and conference calls in September 2012 and October 5, 2012.

c.     Geisler:  Monaghan, Magid and Spaan made 20(a), (b), (c) and (e) on the telephone between April and June, 2013 and on Discovery Day in late June, 2013.  Spaan made 20(d) on the telephone between April and June, 2013.  Magid, Monaghan and Spaan also represented at Discovery Day that Griswold's marketing plan was the "best," that a software program known as "accelacare" was excellent and that their franchise opportunity was superior to other home care franchise opportunities.  None of those representations was true.

d.     Hinders:  Bast made 20(a), (c) in conference calls in October 2012, and Monaghan made 20(a), (c) and (e) at Discovery Day on November 12, 2012.  Michelle Still provided 20(b) on Discovery Day, November 11, 2012.  Bast also provided a spreadsheet that showed projected income and royalty expenses for the franchise on Discovery Day, November 20, 2012.  This spreadsheet constituted an unlawful financial performance representation.

e.     Howland: Magid made 20(a) and (c) in July – September 2012; Monaghan made 20(c) in phone and video conversations in the same time frame; and Magid stated that GHC's independent contractor model operated more efficiently and at less cost than other models.  Magid also made 20(f) in conversations in August and September 2013 and other GHC employees, including Dianne Walker and  Derek Jones, made 20(f) several times at Home Care Academy in January 2013, stating that agencies that could not compete with GHC attacked GHC by spreading "misinformation."  Magid also told Howland in August or September 2012 not to contact Christopher Jenkins prior to purchasing the franchise because, upon information and belief, Magid wanted to keep concerns that Mr. Jenkins had about the IC model hidden from Howland.

f.  Jenkins:  Kent Griswold, Lori Griswold, Patricia O'Malley and Fiona Middleton made all of the foregoing misrepresentations prior to signing the franchise agreement in 2009.  GHC and its representatives also told Jenkins that he could convert to a Staffing Model if there were any problems with the IC Model in California.  On the telephone and in person, Graham Weihmiller represented to Jenkins prior to signing the franchise agreement that the IC model was legal and valid in California.

g.  Luders:  Spann represented that the GHC system was "proven" in an email dated September 14, 2011; Walker and Spann represented that GHC offered full support with state specific compliance in a conference call on October 7, 2011; Spann and Walker made 20(c) and (e) in a conference call October 7, 2011; Spaan made 20(f) in various telephone calls between September 14 and October 24, 2011.  Spaan further represented in an email dated September 14, 2011 that GHC had "unparalleled on-going support;" a "proven franchise model" and "proven franchise systems and support," none of which was true.  In a call September 14, 2011, Spaan said that average profit per territory was $170,000 to $230,000 and that the franchise should break even in 4 to 6 months, all of which was a blatant violation of the California Franchise Investment Law.  In an email dated September 22, 2011, Spaan represented that there were no limitations on the non-medical services that GHC franchisees could provide.  Between September 15, 2011 and October 24, 2011, Spaan stated that every GHC franchise owner had renewed if and when applicable; that in the first year, a typical unit will have 60 to 65 caregivers, that most franchisees meet minimum royalty thresholds in 8 to 10 months; and that Luders would be able to obtain a franchise for a new "staffing model" free of charge when available.  On October 7, 2011 Luders expressed concern over misclassification of employees as independent contractors, and Walker represented that as long as he followed the GHC model, that the Caregivers would qualify as independent contractors.  Walker knew, but failed to disclose, that there were considerable doubts as to whether GHC's independent contractor model indeed was viable, and knew that it was being questioned in other jurisdictions.

h.  McKaig:  Magid made 20(a) by email on July 4, 2012; 20(b) and (c) in telephone conversations prior to signing the agreement; and 20(d) in emails prior to signing the agreement. Monaghan made 20(e) on the telephone in March, 2014.  Magid also told McKaig on the telephone in or around August 2012 not to contact Christopher Jenkins prior to purchasing the franchise because, upon information and belief, Magid wanted to keep concerns that Mr. Jenkins had about the IC model hidden from McKaig.

i.  Peters:  Greg Bast made 20(a) in a teleconference presentation in August 2012; 20(d) in a presentation shortly after the FDD was presented; Bast and Monaghan made 20(c) in calls in November, 2012.

j.  Redmon:  Magid and Monaghan made all the misrepresentations set forth in paragraph 20 during Discovery Day in Philadelphia on

or about October 27, 2011.  Magid made all the representations in various telephone conversations to the Redmons in August through October, 2011.   Additionally, in calls August 9, 2011, September 6, 9 and 29, 2011, October 3, 2011, November 4 and 26, 2011 Magid repeated that GHC had a unique and proven model; that a territory of 300,000 people would earn $400,000 a year; that GHC franchisees had a success rate of 97 percent; that GHC had the highest average unit sales compared to the competition; and that franchisee revenues had always exceeded the amount required to pay minimum royalties.  Magid, Weihmiller and Monaghan all represented that GHC had a unique and proven model at Discovery Day on October 27, 2011.

k.   Thelen:  Spaan made 20(a) in the initial conversation in May 2012. 20(b) in phone conversations reviewing the FDD on May 30, 2012; specifically, Thelen asked what help he would receive to ensure he met all legal requirements, and Spaan responded that GHC had a lawyer on staff to make sure all legal regulations were completed; Spaan repeated that GHC had been doing this for 30 years and had several other operators in California, so the legality of the independent contractor model was not an issue.  Spaan made 20(c) on the telephone in June 2012, stating that the Independent Contractor model "avoided a lot of useless taxes and insurance coverage."  Spaan represented that GHC used the best lawyers to maintain compliance in a telephone conversation June 27, 2012.  Spaan also represented, in a phone call June 5, 2012 that someone from GHC would accompany him on his first sales calls, which never happened.

22.   Based upon these representations, Plaintiffs entered into Franchise Agreements to become GHC franchisees and paid substantial franchise fees, in excess of $35,000 per territory.  Thereafter, in reliance upon GHC's representations, Plaintiffs proceeded to make investments to equip themselves as franchisees and to start their businesses, to give up other income opportunities, and to devote themselves to becoming and developing businesses as GHC franchisees.

23.   At training, GHC, specifically through Diane Walker, further perpetuated and reiterated these representations by telling franchisees that GHC was different from other franchises, that in over 30 years no Client was found to be an employer of a Caregiver, and that GHC had been audited by the IRS, various departments of labor and workers' compensation, and other state and local organizations and that the IC Model had always withstood these audits since it was time-tested and based upon expert legal advice.

24.     Also in training, franchisees were told by GHC representatives to provide prospective Clients with a document called "Silver Bullets." The "Silver Bullets" document emphasized the legality of the independent contractor model and that GHC self-employed Caregivers were better than employed Caregivers.

25.     Pursuant to the Franchise Agreements and as part of them, GHC furnished Plaintiffs with a form called "Information on Relationships," to be signed by prospective Caregivers, that states "Caregivers. . . operate as independent contractors and are not employees…. Independent contractors are self-employed persons responsible for paying their own income-related federal, state and local taxes … including FICA…and are not eligible for work-related benefits from Griswold Home Care." Additionally, GHC furnished Plaintiffs with a document to be given to Clients entitled "Griswold Home Care Referred Caregivers" that states Caregivers are independent contractors who are "self-employed workers who are solely responsible for their own taxes…." Further, "Griswold Home Care has received confirmation of the Caregivers' independent contractor status via SS-8 ruling from the Internal Revenue Service." This memorandum compared Caregivers to independent plumbers or carpenters that Clients hired for jobs in their homes.

26.     Plaintiffs opened their franchises and began operating their businesses, but only in November 2013 did they begin to discover that the representations made by GHC and other Defendants had been false, incomplete, half-truths or misleading. In particular:

- The GHC "Independent Contractor Model" was not proven and was widely criticized, disfavored and considered to be unlawful, risky or unworkable in California and in fact was known by GHC to carry challenges and substantial risks that Clients or Franchisees could be liable for misclassification of Caregivers.

- GHC did not have a "progressive team of experts on the cutting edge of business development strategy and execution." In fact, GHC's principal executives were from automotive aftermarket franchisors, such as Maaco and Aamco, and had little depth of experience with home care; GHC had been unable to retain in-house legal counsel with knowledge of the non-medical home care industry for any sustained period of time; and GHC's principal franchisee advisor on state legal issues was not an attorney.

- GHC did not provide support with state specific compliance, nor did it provide any benefits of being "engaged politically." In fact, it failed to disclose that California had been actively considering changes to the law that would cause GHC to change the IC Model.

- GHC had not been successfully operating the IC Model for 30 years. In fact, because of challenges to the independent contractor model in other states, it had gone to a Staffing Model in Massachusetts, and, as early as 2001, had shifted to a model under which Clients paid workers' compensation and unemployment insurance in New Jersey as early as 2001, and has adopted modifications to its model in other jurisdictions as well, including, Virginia, Maryland, Illinois and Texas, and possibly others.

- GHC failed to disclose that "Federal Safe Harbor Code 530" and "Federal IRS Code 3506" were federal laws and regulations that had no bearing at all on state law and that state law could dictate that a person was an employee while these federal laws held that they were independent contractors.

- GHC never provided guidance to franchisees to keep the IC Model compliant.

- GHC knew or should have known that the American Board of Home Care had long taken the position that the IC Model was not lawful and is disfavored.

- The issue of the viability of the IC Model had been a topic of hot debate in California for some years and the status of Caregivers as independent contractors was anything but certain.

- GHC knew, or should have know, that misclassifications of employees as independent contractors was a substantial and "hot" issue, beginning at least as early as 2009, throughout the United States. Because of the type of work that Caregivers performed and the conditions under which they performed it, Caregivers were particularly susceptible to having their status as independent contractors challenged.

- The population of Client referral sources in the marketplace was well educated about the weaknesses of the independent contractor model and was far more resistant to it than GHC had represented.

- In fact, GHC and its representatives were not competent to advise Franchisees as to the status of the IC Model under California law; none of the GHC representatives who dealt with Plaintiffs were attorneys, much less attorneys admitted to practice under the laws of the State of California.

27.     At the end of 2013, the California Legislature passed and the Governor signed, AB 241, a law that applied to non-medical home care workers and that, among other things, required that they be paid overtime.

28.   On December 31, 2013, at the end of the day, GHC sent a communication to Plaintiffs advising them of the passage of AB 241 and stating, in substance, that the new law may require that Caregivers be paid time and a half for overtime hours, and may require that many Caregivers be classified as employees, and further suggesting that new disclosures be made to new and existing clients.  The December 31 communication also advised that the new law provided that employment agencies could register to be exempt from being deemed the employer of the Caregivers it placed, and GHC recommended that Plaintiffs should elect to register as employment agencies.

29.   Becoming employment agencies had several implications that materially modify the rights and obligations of the Plaintiffs under their franchise agreements:

- It meant that the Clients, instead of being persons hiring independent contractors, could now be deemed the employer;

- It meant that the franchisees, as employment agencies, could collect only a one-time fee from the Client, for placing of the Caregiver, and had to give up continuing fees for ancillary services;   this effectively would render Plaintiffs' businesses uneconomical to operate.

- Franchisees would, as employment agencies, have to post a bond in order to operate lawfully.

30.   In addition, GHC provided franchisees with draft materials intended to be furnished to their Clients, informing the Clients that they might be operating as employers and suggesting that they retain counsel to determine whether they should comply with employment laws.   Subsequently however, GHC has refused to authorize Plaintiffs to disseminate those materials, and thereafter, GHC took the position that it would not permit the dissemination of the materials that it had specifically prepared to be given to Clients upon the grounds that it "did not give legal advice."

31.   GHC's position that it did not give legal advice was another misrepresentation, since its direction to California Franchisees to become employment agencies was based upon its interpretation of AB 241.  In other words,

GHC was advising the Franchisees with respect to California law and was additionally simultaneously instructing the Franchisees to withhold from Clients what GHC knew to be the truth—namely, that under California law, there was a great likelihood that the Clients were acting as employers and were required to comply with California's employment laws.

32. In mid-February 2014, Griswold mandated its Franchisees to become employment agencies, that Clients become employers and that they abandon the IC Model.

33. Subsequently, the California Employment Development Department audited a GHC franchisee and determined that the Client was an employer, contrary to GHC's representations.

34. As a result of GHC's misrepresentations, its unlawful legal advice, its inaccurate advice (whether or not it was legal advice), and its breaches of contract, the Franchisees currently have businesses that they cannot operate with the assurance that they are acting lawfully, and can no longer represent to Clients or to the public that their Caregivers are lawful independent contractors. Plaintiffs have lost the value of their businesses and have otherwise been substantially damaged.

35. The mandate by GHC that Plaintiffs must convert their businesses to employment agencies, and must now treat Caregivers as employees of the Clients constitute material modifications of the franchise agreement and opportunity offered and sold to Plaintiffs. The mandate of a material modification that substantially changes the business rights of the franchisees constitutes a material breach of the franchise agreements.

36. Now that the challenges to the IC Model in California are clear and embodied in AB241, the subject matter of the Plaintiffs' franchise agreements has been destroyed, and Plaintiffs have the right to rescind their franchise agreements and be discharged of any further obligations under the agreements.

37. Pleading additionally and in the alternative and not as an election of remedies, Plaintiffs hereby offer or have offered to return to GHC the franchises that they were purportedly granted and the so-called benefits under the Franchise Agreements, and have tendered their rescission of those Agreements.

38. Pleading additionally and in the alternative and not as an election of remedies, Plaintiffs should be granted relief in the form of an award of their damages.

39. Plaintiffs also sought to mediate with GHC, as required by their Agreements, and GHC has refused to do so, thereby waiving any requirement that they mediate.

40. GHC, through Monaghan, has further breached the Franchise Agreements' dispute resolution provisions and the implied covenant of good faith and fair dealing by responding to Plaintiffs' good faith concerns about their franchises and their attempts to negotiate and mediate a resolution of their issues with a campaign of intimidation, harassment and bad faith actions. Specifically, Monaghan has:

     a. Ignored the Franchisees' requests for information.

     b. Ignored the Franchisees' requests for negotiation or mediation.

     c. Insisted on meeting with some of the Plaintiffs, when Monaghan has been accompanied by Magid and the franchisee was alone.

     d. Told the Plaintiffs that if they brought suit, GHC had a war chest of a million dollars and that because it had more money than the franchisees, it would outlast them.

     e. Refused to allow Plaintiffs to bring their counsel with them.

     f. Told them that if they brought suit, no one would win except the lawyers.

     g. Told them that his two-on-one bullying sessions constituted "mediation."

41. Some of the individual Plaintiffs were asked to sign documents that contained sections purporting to be releases of claims against GHC and of parties

related to GHC as a condition of assigning their franchises to corporate or limited liability entities.  Such releases were void and of no effect because (a) they purported to release GHC from liability under the CFIL and CFRA as a condition to entering into a franchise agreement, in violation of the "no-waiver" provisions of those laws; (b) the releases were void under California law with respect to Plaintiffs' claims, which were unknown to them at the time, because the releases failed to conform to the language required by California law; and (c) the releases constituted material modifications of the franchise agreements, which  required re-registration of the FDD and re-disclosure to Plaintiffs.

## COUNT ONE

### (Violation of the California Franchise Investment Law)

42.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

43.     The business arrangement between Plaintiffs and Defendants is a franchise as it is defined by the California Franchise Investment Law.

44.     Cal. Corp. Code § 31300 provides that any person who offers or sells a franchise in violation of §§ 31101, 31110, 31119, 31200, or 31202, or in violation of any provision that provides an exemption from the provisions of Chapter 2, shall be liable to the franchisee or subfranchisor who may sue for damages, and if the violation is willful, the franchisee or subfranchisor may also sue for rescission.

45.     Cal. Corp. Code § 31201 prohibits making written or oral communications that include untrue statements of material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

46.     GHC made the foregoing misrepresentations of fact in connection with its sale of franchises to Plaintiffs, and in violation of Cal. Corp. Code § 31201.

47.     Under Cal. Corp. Code § 31302, certain officers and control persons of GHC are liable for GHC's violations of the California Franchise Investment Law.

Weihmiller, Monaghan, Walker and Magid are such persons and are equally liable with GHC for those violations; Monaghan, Walker, Magid, Spaan and Bast made misrepresentations as set forth above, in violation of the CFIL.

48.    As a result of Defendants' unlawful conduct, Plaintiffs are entitled to damages in excess of $3 million, rescission of their Franchise Agreements, and in light of GHC's willful and bad faith violations Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to, among other grounds, Cal. Code of Civ. Proc. § 1021.5.

## COUNT TWO

### (Fraud)

49.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

50.    Defendants made the foregoing misrepresentations of material fact set forth in paragraphs 20 and 21 with the knowledge that they were false, and with the intent that Plaintiffs rely upon them to their detriment in purchasing their franchises. The true facts were as forth in paragraphs 2, 3, 4, 7, 18, 19, and 26.   Plaintiffs reasonably relied upon Defendants' statements in entering into their franchises.

51.    As a result of Defendants' fraud, Plaintiffs have been injured in an amount to be determined at trial, but in no event less than $3 million.

52.    In addition to actual damages, because Defendants acted with oppression, fraud and malice, and because Defendants' conduct was willfully false and egregious and showed a willful and conscious disregard for the rights and interests of others, including not only Plaintiffs but also Clients and Caregivers, Plaintiffs demand punitive damages of no less than $5 million.

## COUNT THREE

### (Negligent Misrepresentation)

53.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

54.    Defendants made the representations of material fact set forth in paragraphs 20 and 21.

55.    These representations were in fact false.  The truth was as set forth in paragraphs 2, 3, 4, 7, 18, 19, and 26.

56.    When Defendants made these representations, Defendants had no reasonable grounds for believing the representations were true.

57.    Defendants also knew that Plaintiffs would rely on Defendants to be forthright and truthful in the presentation of facts with respect to the franchise.

58.    Defendants made the representations with the intent to defraud and induce Plaintiffs to purchase GHC franchises.

59.    At the time Plaintiffs acted, Plaintiffs did not know the representations were false and believed they were true.

60.    Plaintiffs acted in justifiable reliance upon the truth of Defendants' representations.

61.    As a result of Defendants' false representations of material facts to Plaintiffs, Plaintiffs have suffered damages in an amount to be proven at trial, but in no event less than $3 million.

## COUNT FOUR

### (Fraudulent Concealment)

62.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

63.    Defendants concealed or suppressed material facts as set forth in paragraphs 2, 3, 4, 7, 18, 19, and 26.

64.     Defendants concealed or suppressed material facts Defendants were bound to disclose and also by telling Plaintiffs other facts as set forth in paragraphs in 20 and 21 to mislead Plaintiffs and prevent Plaintiffs from discovering the concealed or suppressed facts.

65.     Defendant concealed or suppressed these facts with the intent to defraud and induce Plaintiffs to purchase GHC franchises.

66.     At the time Plaintiffs acted, Plaintiffs were unaware of the concealed or suppressed facts and would not have purchased the GHC franchises if Plaintiffs had known the facts.

67.     Plaintiffs acted in justifiable reliance upon the concealment or suppression of material facts by Defendants.

68.     As a result of Defendants' concealment or suppression of material facts, Plaintiffs have suffered damages in an amount to be proven at trial, but in no event less than $3 million.

69.     In addition to actual damages, because Defendants acted with oppression, fraud and malice, and because Defendants' conduct was willfully false and egregious and showed a willful and conscious disregard for the rights and interests of others, including not only Plaintiffs but also Clients and Caregivers, Plaintiffs demand punitive damages of no less than $5 million.

## COUNT FIVE

### (Violation of California Franchise Relations Act)

70.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

71.     Pursuant to the California Franchise Relations Act, Cal. Bus. & Prof. Code § 20000 *et seq.*, a franchisor may not terminate a franchise relationship without first giving the franchisee a notice of default and an opportunity to cure of not less than thirty (30) days.

1   72.    GHC wrongfully terminated Plaintiffs' Franchise Agreements, in

2   violation of the California Franchise Relations Act, by insisting that they convert to

3   an Employment Model and by refusing to permit them to communicate with Clients

4   about the changes in the law, both of which made it impossible for Plaintiffs to

5   continue to operate on the Independent Contractor Model which they had been sold.

6   73.    As a result of Defendants' wrongful termination of their franchises,

7   Plaintiffs have suffered damages in an amount to be determined at trial, but in no

8   event less than $3 million.

9                                **COUNT SIX**

10                          **(Breach of Contract)**

11   74.    Plaintiffs repeat and reallege the allegations set forth above as though

12   fully set forth herein.

13   75.    Pursuant to the Franchise Agreement, GHC cannot terminate without

14   good cause, and in some instances, notice and an opportunity to cure.

15   76.    GHC's requirement that Plaintiffs convert to an employment agency; its

16   cutting off access to GHC's on-line forms and resources (known as FranConnect); its

17   refusal to support them under the IC model; and its insistence that they not speak to

18   their Clients with respect to changes in the law all constitute material breaches of the

19   Franchise Agreement which effectively terminated it without compliance with the

20   contract's requirements for termination.

21   77.    As a result of Defendants' breaches of their Franchise Agreements,

22   Plaintiffs have been injured in an amount to be determined at trial, but in no event

23   less than $3 million.

24   78.    Cause for destruction of the contract subject matter due to the change in

25   law.

26   WHEREFORE, Plaintiffs request judgment with each item of this prayer for

27   relief additional to and alternative to each other item and not as an election of

28   remedies, as follows:

A.   Awarding them actual damages in an amount to be determined at trial but in no event less than $3 million;

B.   Awarding them a declaration that the Franchise Agreements are rescinded and that they are entitled to recover all of the value with respect to the franchise that they conferred upon Defendants;

C.   Awarding them complete relief in relations to the rescission, also including damages;

D.   Awarding punitive damages of at least $5 million;

E.   Awarding costs, attorneys' fees and expenses, as provided by the parties' agreements and by applicable law; and

F.   Awarding such other and further relief as the Court deems just and proper.

**<u>Jury Demand</u>**

Plaintiffs demand a trial by jury.

DATED:   June 3, 2014           THE LAW OFFICES OF RONALD B. BASS

By:   */s/Ronald B. Bass*
Sandra  L. Benabou
Janice S. Yi
560 Lennon Lane, Suite 100
Walnut Creek, CA 94598
Telphone:  (925) 256-9855
Fascimile:  (925) 943-1427
Email:  ron@bass-law.net
          sandra@bass-law.net
          janice@bass-law.net

*Local Counsel for Plaintiffs*

W. MICHAEL GARNER, P.A.
W. Michael Garner
222 South Ninth Street, Suite 2930
Minneapolis, MN 55402
Telephone:  )612) 259-4800
Fascimile:  (612) 259-4810
Email:  wmgarner@franchisedealerlaw.com

*Plaintiffs' Counsel*

38956_2